# EXHIBIT "G"

 Gmail                                    Conrad Benedetto <benedettolegalassociates@gmail.com>

---

## Nava v. Conrad J. Benedetto - EMAIL SERVICE
3 messages

---

**Joseph Kerr** <jkerr@laffeybuccikent.com>                              Mon, May 17, 2021 at 11:12 AM
To: "Michelle Fioravanti, Esq." <michelle.a.fioravanti@gmail.com>, "conrad_benedetto@comcast.net"
<conrad_benedetto@comcast.net>, "BENEDETTOLEGALASSOCIATES@GMAIL.COM"
<BENEDETTOLEGALASSOCIATES@gmail.com>
Cc: Guy D'Andrea <GDAndrea@laffeybuccikent.com>, Jill Roth <jroth@laffeybuccikent.com>, Kody Gamba
<kgamba@laffeybuccikent.com>, Zachary Wolk <zwolk@laffeybuccikent.com>, "JNvBenedetto@projects.filevine.com"
<JNvBenedetto@projects.filevine.com>

Dear Counsel:


Kindly find attached correspondence as it relates to the above referenced matter and enclosed expert report
of Dr. Veronique Valliere.


Please contact our office with any questions.


Very Truly Yours,


Joseph Kerr


Joseph R. Kerr (he/him/his)

Crime Victim Paralegal

LAFFEY BUCCI  KENT, LLP

1100 Ludlow Street, Unit 300

Philadelphia, PA 19107

Main No.: (215) 399-9255

Direct No.: (215) 399-5774

Fax No.: (215) 241-8700


LAFFEY, BUCCI & KENT, LLP      2020
RECOGNIZED BY
Best Lawyers

**2 attachments**

📄 **Benedetto 05 17 21 enc Valliere Expert Report.pdf**
131K

📄 **Clinical Eval - Nava Final.pdf**
249K

---

**Michelle Fioravanti, Esq.** <michelle.a.fioravanti@gmail.com>                    Tue, May 18, 2021 at 9:44 AM
To: Joseph Kerr <jkerr@laffeybucclkent.com>
Cc: "conrad_benedetto@comcast.net" <conrad_benedetto@comcast.net>,
"BENEDETTOLEGALASSOCIATES@GMAIL.COM" <BENEDETTOLEGALASSOCIATES@gmail.com>, Guy D'Andrea
<GDAndrea@laffeybucclkent.com>, Jill Roth <jroth@laffeybucclkent.com>, Kody Gamba <kgamba@laffeybucclkent.com>,
Zachary Wolk <zwolk@laffeybucclkent.com>, "JNvBenedetto@projects.filevine.com" <JNvBenedetto@projects.filevine.com>

Thank you, Joseph.
[Quoted text hidden]

---

**Michelle Fioravanti, Esq.** <michelle.a.fioravanti@gmail.com>                    Wed, Jul 7, 2021 at 1:15 PM
To: "BENEDETTOLEGALASSOCIATES@GMAIL.COM" <benedettolegalassociates@gmail.com>, Bruni Diaz
<BDiaz@cjbenedettolaw.com>, "Steven C. Feinstein" <feinsteinlawoffice@gmail.com>, Steven Feinstein
<scf97@hotmail.com>

Please see below.
[Quoted text hidden]

---

**2 attachments**

📄 **Benedetto 05 17 21 enc Valliere Expert Report.pdf**
131K

📄 **Clinical Eval - Nava Final.pdf**
249K



**LAFFEY BUCCI KENT** LLP

TRIAL LAWYERS

*BRIAN D. KENT, ESQUIRE*
*DIRECT DIAL: (215) 399-9255*
*E-MAIL: BKENT@LAFFEYBUCCIKENT.COM*

May 17, 2021

<u>Via Email and Regular Mail</u>
Conrad J. Benedetto, Esquire
The Law Offices of Conrad J. Benedetto
1615 South Broad Street
Philadelphia, PA 19148

RE:   **Nava v. Benedetto, et al.**
      **Camden County Superior Court of New Jersey**
      **Docket No.: CAM-L-4588-18**

Dear Mr. Benedetto,

As you are aware, our office represents Plaintiff, Javier Nava in the above referenced case.

Kindly find attached hereto the Expert Report of Veronique N. Valliere, Psy.D. as it relates to

Javier Nava.

Thank you for your time and consideration in this matter. Please contact our office with

any questions.

Very truly yours,

**LAFFEY, BUCCI & KENT**

Brian D. Kent, Esquire
*Attorney for Plaintiff, Javier Nava*

BDK/jrk
Enclosure

1435 WALNUT STREET, 7TH FLOOR, PHILADELPHIA, PA 19102 ı PHONE: 215.399.9255 ı FAX: 215.241.8700 ı LAFFEYBUCCIKENT.COM

# VERONIQUE N. VALLIERE, PSY.D.
# VALLIERE & COUNSELING ASSOCIATES, Inc.

Forensic Treatment Services

P.O. Box 864
Fogelsville, PA 18051
Telephone: (610) 530-8392
Fax: (610) 530-8940

## Clinical Evaluation

**Client:** Nava, Javier
**DOB:** 3/30/83
**Referral Source:** Laffey, Bucci & Kent, LLC

**Clinician:** Veronique N. Valliere, Psy.D.
**Date of Report:** 4/15/21
**Dates of Interviews:** 4/7/21

==================================================================
## Reason for Referral

Javier Nava was referred for an evaluation to assess the psychological, emotional, and social impact of the sexual harassment he suffered at the hands of Mr. John Groff, a representative of the law firm of The Law Offices of Conrad J. Benedetto. Mr. Nava is involved in a lawsuit against John Groff for his conduct and The Law Offices of Conrad J. Benedetto for negligence involving their role and failure to provide adequate protection of Mr. Nava from Mr. Groff. The referral questions include:

- The nature of any psychological harm or impact caused to the victim as a result of the alleged conduct;
- Whether the victim has recovered from the harm or continues to suffer from the harm;
- Evaluation of conditions conducive to the behavior of the defendant(s);
- Assessment of the failure to protect or respond;
- Prognosis with respect to recovery, and how and for how long the harm will impact his life; and,
- Treatment recommendations if necessary, and if required, the nature, extent, and expected duration of the treatment.

Mr. Nava appeared as scheduled for his evaluation, which was performed via secure video conferencing for a total of 3.5 hours. The platform was utilized due to distance and the COVID pandemic. It was through a HIPAA approved telehealth provider. Mr. Nava was coherent and oriented throughout his interview. He demonstrated no overt signs of confusion, incoherence, or psychosis during the interview. The purpose of the interview and the limits to confidentiality were explained. Mr. Nava understood that the disclosures he made and the results of testing (if administered) would be written into an evaluation for his attorney. It appeared that his competence to participate in the interview was not compromised in any way. There was nothing to suggest that his ability to consent to the interview was significantly compromised.

This examiner was informed that English was Mr. Nava's second language. Despite this, Mr. Nava had very little difficulty expressing his feelings and thoughts or conveying his experience. He used a translation program on one occasion during the interview to find words to express himself, specifically the word "arrogant." Mr. Nava was helpful and cooperative when I did not understand how he was pronouncing a word. In the same vein, Mr. Nava asked for clarification and definition of concepts or words I used that he did not fully understand. It did not appear that any significant language barrier impacted the integrity of the interview or evaluation.

This evaluation is limited to the information provided in Mr. Nava's self-report, testing, and one prior interview, an evaluation provided by Mr. Nava performed by a previous evaluator. Any self-report can be impacted by bias. However, Mr. Nava's reported history was entirely consistent with the provided information. There is no reason to question the legitimacy of his self-report.

Nava, Javier                                                               page 2
**Confidential Evaluation**

**Qualifications of Examiner**

I am a clinical and forensic psychologist licensed in the state of Pennsylvania since 1995.  I have a
doctorate in clinical psychology received from Rutgers University in January, 1993.  I have been in
practice, providing treatment, evaluations, assessments, supervision, training, and testimony on victim
issues, offender issues, trauma, sexual assault, interpersonal violence, and other topics for over 25 years.
In my career, I have treated or evaluated thousands of offenders of sexual violence and hundreds of
victims of violence.  I have provided training in victim behavior and dynamics to the FBI, Department of
Justice, all branches of the military, and national and international law enforcement and prosecutors'
offices.  I am the author of *Understanding Victims of Interpersonal Violence* (2019) published by
Routledge Press.  In performing this evaluation, I relied upon my years of clinical experience, as well as
my training in and research and scholarly writings about sexual assault, factors in trauma, and
victimization.

**Test & Techniques**

Clinical Interview (total 3.5 hours)
Collateral Interviews
        Ms. Anita Busch – friend (45 minutes)
Review of Records:
        Amended Complaint
        Article from <u>New York Times</u>, retrieved from www.nytimes.com/2018/04/30/us/mass-shooting
        Article from <u>Newsweek</u>, retrieved from www.newsweek.com/law-firm-harassed-pulse-shooting
        Audio recording of J. Groff
        Correspondence from Romanucci & Blandin, LLC
        Criminal record of J. Groff
        Photographs provided by J. Nava
        Screenshots of text messages between J. Nava and J. Groff
        Screenshots of text messages between participants over weekend of incident
Testing:
        Trauma Symptom Inventory – 2nd Edition (TSI-2).  *Not performed*

**Offense/Incident Information**

On June 12, 2016, Mr. Nava was a victim of the shooting at the PULSE nightclub in Orlando, Florida.  Mr.
Nava was shot in the abdomen, but survived.  As a result of his victimization, Mr. Nava was identified by
the Law Firm of Conrad J. Benedetto as a potential client for a lawsuit involving the shooting.  They
entered an attorney-client relationship.

At that point, Mr. Nava did not know that soliciting victims of mass shootings would be expected of him.
In fact, Mr. Groff and the law firm presented themselves in a concerned and empathic manner to victims
of mass shootings.  They established a Facebook group offering support for survivors of mass shootings,
with the purpose of helping "each other through our healing process."  Mr. Groff apparently presented
himself as a survivor to facilitate his contact with victims of mass shootings.  In a statement provided to
<u>Newsweek</u>, Mr. Groff indicated that he gave the victims "an opportunity to find healing" with other
victims.  The law firm repeatedly acknowledged in the media that they were aware that they dealt with
individuals who were "seriously injured and emotionally distressed."

Because Mr. Nava trusted the representation of the law firm and believed that the firm and its
representatives upheld the best interests of the victims emotionally and psychologically, not just
financially, he became a client.  Mr. Nava was vulnerable and felt unsafe due to his trauma from the
shooting.  He experienced Mr. Groff as having a "strong" personality.  As a representative of the law firm,
Mr. Nava "felt safe" that Mr. Groff and who he represented would be able to protect him and help other

Nava, Javier                                                                                    page 3
                                    **Confidential Evaluation**

victims. He thought Mr. Groff's personality was "strong," which meant he would be "strong professionally." Regarding the law firm, "I thought they were strong people who were fight hard for our case." He also made a decision to be more deeply involved with them when they requested that he accompany Mr. Groff, who was representing the firm, and other victims to visit with victims of other mass shootings.

On October 1, 2017, a mass shooting occurred in Las Vegas. The firm and Mr. Groff contacted Mr. Nava to invite him to accompany a group to Las Vegas to provide support and validation to the survivors of the shooting. Mr. Nava, being a survivor himself, was told and believed he and other victims were in a unique position to offer that support. Mr. Nava was enthusiastic about being part of that mission. The firm, through Mr. Groff, stated that they would pay for all Mr. Nava's food, lodging, and transportation in exchange for his participation. Mr. Groff was responsible for all of the driving and activities as well, including getting everyone together to have meals so he could pay. The firm did not give the participants cash to care for themselves. Mr. Nava was grateful for the opportunity and effusive about the positive efforts of the law firm to support victims. Mr. Nava did not yet realize that he would be expected to recruit clients during the trip. He accompanied Mr. Groff as part of a group to Las Vegas. Here, the group met numerous survivors as well as other advocates, journalists, and supporters involved with the crisis of mass shootings.

During their trip to Las Vegas, "everything seemed normal." Mr. Nava said, "There is no harassment to my person at that moment." (Later, he found out that Mr. Groff had harassed his friend Brian). However, he said, "There's nothing weird in the first trip in Las Vegas. We went to talk to survivors." During that trip, Mr. Groff began to indoctrinate the victims of his group to solicit clientele and promote the law firm. For instance, Mr. Nava participated in a promotional video for the firm. He felt uncomfortable, but did it. During the trip, Mr. Nava noticed that Mr. Groff was acting differently towards another victim named Brian, but did not understand why. However, overall, Mr. Nava's trip was successful and without any major incident, furthering Mr. Nava's trust in and reliance on the law firm and Mr. Groff despite the uncomfortable moments. They went several places, like the Grand Canyon.

A few weeks later, the firm invited Mr. Nava to go to California. The plan was to go on a "tour for survivors" visiting four or five cities in California. For the most part, it was the same group of men. However, Brian did not attend. Mr. Nava went on the trip with Mr. Groff, "Omar, Christopher, and Angel."

During the second stop in California, "that's when it all started." Mr. Groff asked Mr. Nava to go to a barbershop to get their hair cut. He began questioning Mr. Nava about whether or not he got manicures. When Mr. Nava said that he didn't "do that," Mr. Groff told him he "should be" because he didn't "like people scratching him," making a sexual innuendo. He put his hand on Mr. Nava's shoulder. Mr. Nava was uncomfortable, but thought it was a "really bad joke."

Mr. Nava went on to explain that Mr. Groff had a personality that was difficult to understand initially. He was "arrogant, cocky." Mr. Nava said, "If you met him, you won't like him right away." He described Mr. Groff as somewhat abrasive, so thought he was just making a crude joke. Mr. Nava also admired Mr. Groff. He believed that he was strong and dominant, able to fight for the victims that he said he was representing.

After they got their hair cut, Mr. Nava tried to pay, but Mr. Groff paid. They went back to the hotel where the rest of the group was waiting to eat. They began walking around trying to choose a place. Mr. Nava suggested going for tacos, wanting to try California tacos. Mr. Groff made a joke about him being a Mexican, but added that wherever Mr. Nava "wanted to eat is where they were going to eat." To Mr. Nava, this was a signal that Mr. Groff was interested in him, something he didn't understand.

Nava, Javier                                                                page 4
## Confidential Evaluation

After dinner, the group went back to the hotel and went their separate ways.  At about 4:45 p.m., Mr. Groff started texting Mr. Nava.  He invited Mr. Nava to his room after commenting that his roommate was not who he wanted on his bed.  Mr. Groff texted "You could be where [sic] relaxing and enjoying yourself."  Mr. Nava did not respond.  When Mr. Groff wrote that Mr. Nava would "be in heaven," Mr. Nava responded, "Omg. . . hahahhaa."  At 6:45 p.m., Mr. Groff texted, "Now I can fuck with you," going on to mention Mr. Nava's nails.  "So when I am relaxing you and you go crazy you can't scratch me lmao," he texted, to which Mr. Nava responded, "Omg you crazy . . ."  "I was ignoring him in a good way," Mr. Nava stated, "I was laughing and not responding."  As a response, Mr. Groff sent a pornographic image of two young men engaged sexually, followed by a three pictures of porn star.  "He started more and more," Mr. Nava said, "I felt like I had no control of the situation."  He became more upset and was "not sure how I was going to look at him the next day."

Mr. Groff began openly sexually texting Mr. Nava.  Mr. Nava responded with emojis of shock and laughter.  He then stopped responding to Mr. Groff.  At 7:47 p.m., Mr. Groff texted, "Bitch Answer me." Mr. Nava responded with laughter emojis and a brief text about Mr. Groff being "lucky with that toy."  At 10:04 p.m., Mr. Groff sent a picture of himself with a very young looking Hispanic or biracial man, bragging about how he can "make it happen" and that he is a "freak."  Mr. Nava texted that he is "a good boy."  In response, Mr. Groff texted a picture of the young man appearing to suck Mr. Groff's penis, again propositioning Mr. Nava.  When Mr. Nava refuses to engage, then texted "No no nooouuu my friend!!!" with emojis, Mr. Groff began explicitly texting about sucking Mr. Nava's "dick," adding, "if you wanted to get your ass eaten I will do that too."  Twenty minutes later, Mr. Nava refused.  Mr. Groff persisted, even using an image of begging hands, forcing Mr. Nava to ask Mr. Nava to "let go" and refuse seven more times.  Finally, at 12:37 a.m., Mr. Groff texted, "Oh wow you can't even talk.  Fuck it I'm good  done since you can't give me even a fucking conversation."  Mr. Nava said he was very upset by this point.

Additionally, during that evening, Mr. Nava and Chris went to a bar for about an hour.  Chris was talking about it the next day and Mr. Groff got angry.  "We're not on vacation," he said aggressively to Chris. Mr. Groff made more comments about that the next day.

Mr. Nava became so upset and uncomfortable, he told all the men in the group what was happening, gathering them together without Mr. Groff.  One of the group members, Angel, began laughing at Mr. Nava, saying he was a "lucky guy."  Mr. Nava said he was not comfortable and felt like he should go back home, fly back to Florida.  Omar pleaded with Mr. Nava to stay.  He asked Mr. Nava to "ignore him," saying that the group needed Mr. Nava.  Mr. Nava said that he "couldn't handle it" and wanted to go home.  He knew there were two or three more cities to visit and did not want to stay.  However, Mr. Groff "was in charge."  "It was hard to ignore him," Mr. Nava explained, "he paid for everything."  Mr. Nava was also afraid of Mr. Groff's retaliation.  "When he realized I didn't accept it, he became really upset," Mr. Nava stated.

The next morning, it was clear Mr. Groff was "really upset."  "He was bad with us, especially with Chris," Mr. Nava stated, "Chris kept me company he was always with me.  He gave me emotional support."  Mr. Nava felt very close with Chris who he said could make a person "feel better in a couple of words."  "He told me if I stayed on the trip he would stay with me all the time."  That next morning, Mr. Groff called Omar and Angel and the three of them went for breakfast.  They left Mr. Nava and Chris behind without money to eat.  Mr. Nava called Omar, asking where the rest of the group was.  The other men reassured Mr. Nava that "John was only a little upset, don't worry."  However, Mr. Groff began leaving Mr. Nava and Chris out of the groups and wouldn't take them for meals.

The group went to the next city.  The plan was to meet a journalist friend of Mr. Nava's, Anita Busch. Mr. Nava also wanted to visit his elderly aunt and uncle who lived in the same town.  Mr. Groff became very upset, but Mr. Nava went to visit his aunt and uncle.  The rest of the group went to Ms. Busch's house.  When Mr. Nava was finished his visit and returned to the group, Mr. Groff accused him of

Nava, Javier                                                                      page 5
                              **Confidential Evaluation**

meeting another man and was very agitated. Mr. Nava was very uncomfortable. Chris had informed Ms. Busch about what was happening and she recommended they call the police. When they did, the police informed Mr. Nava that nothing could be done because he and Mr. Groff were both adults. Mr. Nava did not want to leave with Mr. Groff, but had no other way home.

The group began the trip to the last city the next morning. Mr. Groff was extremely agitated. In fact, he just left for the 4 to 5 hour trip without asking anyone if they wanted to eat. "Everyone is uncomfortable," Mr. Nava described about the time. He stated Mr. Groff "responded aggressively" to everything asked of him. For most of the rest of the time, Mr. Nava had to rely on others for food as Mr. Groff did not buy him food. The rest of the trip, Mr. Nava said he was feeling "angry and sad." "I had to ask for food, I felt like I was begging," he said.

When they arrived at their next stop, they had a meeting. Then Mr. Groff ordered food and had it brought to his hotel room. Everyone in the group had to go to Mr. Groff's hotel room. "That's when I really started to feel fear," Mr. Nava stated. He described seeing Mr. Groff "fighting on social media" with someone. When the person criticized the law firm, saying that they were just trying to get victims — not trying to help, Mr. Groff lashed out. Mr. Groff checked the individual's background using resources from the law firm. He then posted the person's criminal history, making a vague threat, saying something to the effect of, "before you open your mouth, you have to be careful." In fact, a photo of the post shows that Mr. Groff posted an address online, presumably the other person's home address, as well as information about a criminal history. "Make sure your house is not glass cause those stone will get you all the time," says a post from "John Groff." Mr. Nava knew that Mr. Groff had a lot of information and contacts, including information regarding finances. Mr. Nava felt "fear", scared, vulnerable."

The next day, Mr. Groff was "still upset" and driving in an agitated way. He was on the phone, "drifting lanes, cursing other drivers, saying bad words." At some point he started fighting with a woman on the phone, a representative of Expedia. He got "out of control" and threw the phone at the windshield. Mr. Nava recorded part of this outburst, which corroborated his report. Mr. Groff began screaming at the group, saying he was tired of all of them and "tired of this bullshit." He yelled, "All of this was for nothing! I'm not getting clients!" This is when Mr. Nava realized fully that he was being used. After this, Mr. Nava texted Omar and said he wanted to leave. He said the situation was "getting out of control." They went to the airport. Mr. Nava was able to fly home. He said that when he was dropped off at the airport he "called [his] husband and began to cry."

Mr. Nava stated, "That day – it'll mark my memory. I'll never forget it. I was desperate to leave." He went on, "Once the airplane took off and I saw it out the window, I just started crying because I felt safe." This memory still evokes emotion in Mr. Nava, who began crying during the interview. He has not had contact with Mr. Groff since that time.

However, this was not the last time Mr. Groff contacted them. A couple weeks later, Mr. Groff called Adrian, Mr. Nava's husband, to invite him on a trip, without Mr. Nava. Adrian refused.

**Relevant Historical Information**

*No collateral records were reviewed regarding Mr. Nava's history. Mr. Nava provided his history through self-report.*

Mr. Nava is a 38-year-old, married Mexican male. He is shorter than average and slender, with brown eyes and black hair. He looks younger than his stated age. He wore a beard at the time of his interview.

Nava, Javier                                                                            page 6
                        **Confidential Evaluation**

Mr. Nava was born and raised in Mexico City. He is the youngest of six children born to his mother. He is the only child of both biological parents. His eldest sibling is 15 years older than him, the one closest to him is seven years older, so Mr. Nava was not raised with most of his siblings.

Some of Mr. Nava's siblings were raised in North Carolina where they were born. Mr. Nava's mother moved back to Mexico with his sisters before Mr. Nava was born. His mother and sisters remain in Mexico. Mr. Nava's father was never part of his life. Mr. Nava stayed in Mexico until he was 21 years old. He came to the U.S. to North Carolina crossing illegally with a family friend. He came to the U.S. to work.

Mr. Nava denied any history of abuse during his childhood. However, he said the family "struggled for money." He "thought this is was normal." "Now I can see we were poor," Mr. Nava stated. They always had a home, but did not have luxuries. His mother had to work very long hours. This required Mr. Nava to be "very independent." At a young age he was "self-sufficient." He cooked and took care of himself.

Mr. Nava denied any childhood behavioral problems. He denied any school issues or learning disabilities. If Mr. Nava ever got in trouble, it was because he would "talk a lot" in school to friends. He achieved good grades and never had any contact with the law as a youth. He was never diagnosed with any psychological or behavioral issues as a child. He denied any history of conduct-disordered behavior including aggression, truancy, cruelty, running away, or vandalism.

Mr. Nava graduated high school in Mexico. He worked after school at an insurance emergency call center. When he came to North Carolina, he worked with a family friend in construction. He could not speak the English at all. Once Mr. Nava came to North Carolina he worked in construction for approximately five years. "My circumstances didn't let me pick a different job," he said. Two years after he came to the U.S., he met his first "gay friend." He began meeting people and learning the language. He developed a support group. After about 10 years in North Carolina, Mr. Nava moved to Florida. He now primarily works in the restaurant industry.

Mr. Nava has never been arrested or detained. Mr. Nava has only had contact with the law regarding driving without a license. When he was in North Carolina, he got pulled over numerous times. Mr. Nava believed that this was at least in part because he was a minority. His traffic violations were typically involving driving without a license.

Mr. Nava began teaching himself English. He would use a translator program to understand the texts he would get. Additionally, Mr. Nava meant a group of·other gay men who he befriended. They helped teach him the language.

Mr. Nava never identified himself as gay to his family. In fact, he was outed as a result of the PULSE shooting. The media in Mexico gave attention to him as the only Mexican survivor. This was how his family learned that he was gay and that he was married to his husband. Mr. Nava's family accepted him.

Mr. Nava has one son who currently lives with him. He and the baby's mother were together when Mr. Nava was just out of high school. They were together one year. Mr. Nava spoke very warmly and affectionately about his son. His son has lived with him since 2016, following the shooting. He described his son as "very courageous" to come to the United States without knowing the language. His son started school and was "quiet" for many years but now is coming out of his shell and speaking, having attained enough language to feel comfortable. Mr. Nava was "very proud" of his son. He was highly empathetic towards him, noting that his son would "cross over people who were mean and impatient" to him because of his race and language difficulties.

Mr. Nava and his husband were married in May 2015 after dating for approximately eight months. Mr. Nava spoke very positively about his husband. He denied that the relationship was abusive in any way.

Nava, Javier                                                                          page 7
### Confidential Evaluation

Mr. Nava was in one other primary relationship for approximately a year and a half prior to meeting his husband. His partner physically and verbally abused him. Mr. Nava left the man after being assaulted.

Prior to the PULSE shooting, Mr. Nava had no mental health history. He had never been suicidal or medicated for any psychological disorder. Mr. Nava began therapy following the PULSE shooting. He attended therapy for some years. However, his therapist left the facility where he was receiving therapy and Mr. Nava does not know how to reach her. He was unclear on how to get his therapeutic records. Mr. Nava has no history of substance abuse. He has never received substance abuse treatment.

## Interview Information

Mr. Nava appeared for his scheduled interview. There was initial difficulty with the appointment time that was remediated within the same week. Mr. Nava consented to the interview, understanding that he would not have confidentiality. He agreed to participate and had privacy throughout the interview.

Mr. Nava was coherent and oriented throughout his interview. He showed no significant clinical symptomology, such as overt anxiety or depression. Mr. Nava became tearful during the interview, once crying overtly. His affect was appropriate to the situation and what he was describing.

Interpersonally, Mr. Nava was very pleasant to interview. He was cooperative and seemed to share fully. He elaborated when asked. He did not present as evasive, deceptive, or exaggerating in any way. He did not try to control the interview, did not interrupt, and was able to build rapport over the evaluation. Mr. Nava did not contradict anything available in his records. His disclosures did not seem memorized, rote, or scripted. Mr. Nava clearly still had emotions related to his experiences. He was able to differentiate his feelings between the trauma he sustained from the shooting versus the impact of Mr. Groff's behaviors. In fact, in some areas, Mr. Nava seemed to have experienced a more detrimental impact by Mr. Groff's behavior than the shooting. He was expressive, clear, and empathetic. Mr. Nava displayed no indicators of significant personality pathology in any way. He was not dramatic, exaggerating, or invested in presenting as a victim. He showed no signs of malingering.

Mr. Nava reported that in the beginning of dealing with Mr. Groff's behavior, it was "very hard, very emotional." "I was very scared," he explained, "he had a lot of contacts -- he could do something to me." Mr. Nava was in therapy and dealt with the harassment by Mr. Groff. In therapy he said he learned to deal with "triggers," both for the shooting and for the harassment. He stated he had made much progress on learning how to calm down. Mr. Nava could better manage talking about Mr. Groff now.

Mr. Nava spoke repeatedly about believing in Mr. Groff and the law firm with whom he was associated. This is described above. Mr. Nava never expected to be sexually solicited by Mr. Groff. He stated that Mr. Groff "never presented as gay." Mr. Nava saw Mr. Groff only as a professional representative of the law firm. Mr. Nava felt betrayed and used when he realized that the purpose of the trips was to get clients. He said he felt like an "object." This was reiterated when Mr. Groff began to sexualize him. When he received the pictures, he thought they were "disgusting" and "out of place." "The trip was professional, now it changed my perspective," Mr. Nava said.

Mr. Nava repeatedly talked about feeling "used" and having his need to help others exploited. Mr. Nava said that he only got involved in the lawsuit after the shooting to help people in the future. Mr. Nava originally got involved with the lawsuit in order to sue the company that sold the shooter the rifle. That's when he understood the initial lawsuit to be about. "Pulse didn't have anything to do with it -- they're victims too," he said, explaining why he did not hold the nightclub responsible. He said he "didn't want to affect anybody," specifically referring to the owners of the nightclub. He said the lawyers "changed," referring both to the law firm and the focus of the suit. Mr. Nava realized too late that the nightclub was being sued and settled. "They took the settlement and left," he said, describing the resolution of the initial lawsuit. His wish to address the gun issue was never fulfilled.

Nava, Javier                                                                                        page 8
**Confidential Evaluation**

Mr. Nava was involved in helping people following the shooting in El Paso, Texas.  He said he was
contacted because he knew how to speak Spanish and could help the Spanish speaking victims.  He said
that the trip was "really hard" because it triggered some of his trauma., "But it made me feel really good
– I was really helping people," Mr. Nava stated.  He went on, again becoming tearful.  He explained,
"That's what I was always looking for – that's what I thought..."  He explained that his sadness was
because that's what he believed the trips with Mr. Groff would afford him - the chance to help people.

Mr. Nava initially refused the idea of suing Mr. Groff or the law firm with whom he worked.  He said he
"was scared."  He was afraid of retaliation and afraid of Mr. Groff.  "His personality is strong," he
explained, "when he is angry, it is scary."  He went on, "At that moment, I felt he was a really powerful
guy."  At the beginning of the lawsuit, Mr. Nava felt guilty.  "I didn't want anything bad to happen to
John," but then Mr. Nava found out that Mr. Groff was doing other things, had a criminal history including
sexual misconduct, and was engaging with other victims.

Now, Mr. Nava is less scared and "more strong."  He feels angry about what Mr. Groff did to him,
especially following the PULSE shooting.  "I have to deal with the mental process and trauma and then
this guy came and put me out my place again," he said, describing how violated and blindsided he felt by
Mr. Groff.  Mr. Nava had persistent worries about what Mr. Groff would do to retaliate against him.  This
lasted for months.  "I was afraid he would send somebody to scare me," he said.  Mr. Nava believed that
this did happen in another form.  After Mr. Nava gave an interview to the New York Times, he received a
letter from the law firm involved with Mr. Groff.  He described the letter as intimidating and referencing a
confidentiality agreement regarding the trips.  He said the letter threatened the settlement and implied
that Mr. Nava could go to jail.

I asked Mr. Nava about whether Mr. Groff knew that he was undocumented at the time.  Mr. Nava said
that he believed Mr. Groff did know.  Mr. Groff made jokes about not being able to go to Mexico because
Mr. Nava could not come back.  He made a joke about running into immigration and having to hide Mr.
Nava.  At one point, Mr. Nava "had to push back."  He was beginning to feel that the jokes were
inappropriate and vaguely threatening, so he told Mr. Groff, "You can't deport me, I am waiting on my
residency."  Mr. Nava explained, "I knew if I let him cross that line, he could take advantage of that." He
described feeling that Mr. Groff's behavior was bullying.  He said he "got tired of the comments" about
his race and his illegal status.

Mr. Groff also made several derogatory and racist comments to Mr. Nava.  When they were driving
through Colorado on the first Las Vegas trip, Mr. Groff referred to Mr. Nava as a "coyote."  "Look," Mr.
Groff said to the group, "in the desert here there are a lot of coyotes, just like Javier."  Mr. Nava didn't
understand this at the time, but now knows that the word "coyote" is a derogatory racist reference to
Mexicans.

Reflecting on other issues regarding why he was chosen by Mr. Groff, Mr. Nava said he was the quieter
one in the group.  He was the smallest man.  He described himself as "more submissive."  He felt that
Mr. Groff chose him because he "didn't speak good English and was not a danger" to Mr. Groff.

Mr. Nava said that he did not have any diagnostic symptoms related to Mr. Groff's behavior.  However,
he has many emotional symptoms.  He has feelings of anger, betrayal, of being used, and of being
exploited.  He carries fear in him about how many people Mr. Groff may have hurt.  He is also extremely
concerned at the level of vulnerability that survivors of mass shootings have at the time Mr. Groff may
have access to them.  Mr. Nava does still have some traumatic symptoms related to the shooting.  He
anticipates shooting sometimes, fearing that "it's the end" and that he is "ready to die."  He still at times
has nightmares.  However, despite the negative thoughts, Mr. Nava said, "I try to balance and always see
the positive in things."

Nava, Javier                                                                        page 9

### Confidential Evaluation

_Collateral Interviews_

This examiner spoke to Anita Busch for approximately 50 minutes. Ms. Busch has known Mr. Nava since the PULSE shooting and had spent at least four different periods of time with him. She met him through her advocacy for mass shooting victims.

Ms. Busch's house was one stop of the group during the trip when Mr. Groff harassed Mr. Nava. Mr. Nava came to her home to meet the group. "That time I met him, he was a different Javie," Ms. Busch said. Before Mr. Nava arrived at her home, she said Mr. Groff was "very angry and upset." She said he was texting angrily ("punching the numbers on the phone") and making accusations that Mr. Nava wasn't visiting his aunt and uncle. She also said that Mr. Groff was "making threats to leave Javier behind." Chris, Mr. Nava's friend, became extremely agitated. When Mr. Groff left to go pick up Mr. Nava, Chris began crying. Ms. Busch didn't know what was happening, but knew something was "very wrong." Chris expressed not wanting to get on the plane with Mr. Groff. Chris eventually explained to Ms. Busch what was happening. He told her that John was being retaliatory because Javier wouldn't comply with his sexual demands. Chris also told Ms. Busch that Mr. Groff wouldn't get them food.

When Mr. Nava arrived, Ms. Busch described him as "closed up." Throughout the whole visit, Mr. Nava was "constantly scared," and "totally introverted." His change in behavior and presentation were so serious it motivated Ms. Busch to call the police. Mr. Nava told her he did not want to be with Mr. Groff. When Mr. Groff threatened to leave Mr. Nava, Ms. Busch perceived it as "a very real threat." Mr. Groff remained agitated for the night. Mr. Nava stood against the wall behind a chair with his eyes averted for most of the visit. Ms. Busch stated that she felt like she watched Mr. Nava "crumble into himself."

### Testing Summary

_No testing was performed in Mr. Nava's case. He did not reveal current symptoms or claim any significant or unusual diagnostic issues. His interview and history did not reveal anything that would raise concerns about problematic personality pathology or malingering. This examiner determined that personality or psychological testing was warranted or would reveal more information to answer the referral issue. If more or different information is provided, psychological testing might prove useful._

### Diagnostic Summary/Offense Impact Analysis

It is possible to perceive Mr. Groff's actions and impact on Mr. Nava as negligible, especially in contrast to the fact that Mr. Nava is a survivor of a mass shooting and was shot himself. However, the psychological and emotional impact of Mr. Groff's behavior might be more insidious and detrimental in some ways.

Suffering an unanticipated event that is terrifying, tragic, and life threatening is profound. It can produce persistent fears, traumatic symptoms, and diagnosable conditions. Posttraumatic Stress Disorder, depression, anxiety, and other disorders can occur from these sudden events. There is no minimizing the potential impact of a mass shooting. However, a mass shooting may lack elements that can complicate an individual's response to a tragic event. In Mr. Nava's case, he does not personalize the shooting. He does not blame himself. He does not blame the nightclub for failing to protect him. He recognizes the impact, the trauma, and the sense of vulnerability the event produced in him, but he does not experience the shooting as a highly personalized event that focused on him.

This is different regarding Mr. Groff's behavior. Mr. Nava experienced a personal sense of betrayal and exploitation by both Mr. Groff and the law firm. He has had to examine himself, his personal vulnerabilities, and his own judgement. His view of his world was once again changed, first by a shooter, but then more importantly by someone he trusted and a system or organization he saw as an avenue to

Nava, Javier                                                                                                   page 10
## Confidential Evaluation

healing and making his world safer.  Mr. Groff furthered his betrayal by calling Mr. Nava's husband to invite him on a trip.

*Betrayal*

Mr. Nava experienced something that researchers and clinicians refer to as "betrayal trauma" – the impact of the violation of trust, safety, or well-being by someone or an institution on which a person relies.  Inherent in this violation is the relationship between the victim and the one who betrays.  In this case, Mr. Nava experienced this from both Mr. Groff and the Benedetto law firm that knew about Mr. Groff's antisociality and former sexual misconduct.  This law firm legitimized Mr. Groff and was directly responsible for giving him access to perfect victims, as well as arming him with money, resources, and power over them.  It was not only that Mr. Nava was betrayed by Mr. Groff, who clearly preyed upon him.  Mr. Nava was betrayed by the system that did not provide a safe setting, failed in his care and supervision, and then allowed Mr. Groff continued access to victims and without consequence for his behavior.  Even if Mr. Nava did not report directly to the law firm initially, the law firm became aware of Mr. Groff's actions and defended him publicly.

Mr. Nava put his trust and faith in a person and organization who betrayed it.  Mr. Groff betrayed it directly in his sexual violation of Mr. Nava.  The law firm betrayed it by putting someone like Mr. Groff with vulnerable people while promoting themselves as protecting the best interests of victims.

*Exploitation of Vulnerability*

People who are in a state of injury, distress, or fear are extremely vulnerable to exploitation.  When individuals have experienced events that they are helpless to control or impact, they are highly likely to reach for beliefs or others that allow them to cope or feel normal or safe again.  In Mr. Nava's case, the Benedetto law firm, and Mr. Groff in particular, offered that.  He perceived Mr. Groff as a representative of a law firm that embodied his own mission to help victims and protect others.  Mr. Groff's "strong" personality – his abrasiveness and aggressiveness – was initially forgiven by Mr. Nava, who perceived it as an asset in fighting for the rights of victims.

Mr. Nava had inherent vulnerabilities going into the situation that were not protected as well.  First, Mr. Nava is an optimistic individual who prefers to see the best in people.  He coped with his experience by mobilizing his efforts to help others, offer comfort, and promote healing, not focused on his own victimization or paralyzed by a pessimistic and anxious orientation.  He would be a perfect candidate to exploit, especially in his initial allegiance to the law firm that he saw in the most positive light.  Mr. Nava also thought he, as an individual, mattered to Mr. Groff and the law firm.  When he discovered he was being used to solicit business, he was extremely disappointed and felt dehumanized, "like an object."

Mr. Nava's personality is one of cooperation.  Not only was he experiencing the disorganizing effects of being shot and in a mass shooting, he is generally more quiet and submissive.  This appears to be Mr. Nava's pre-existing personality, exacerbated by his experiences as a non-English speaking minority who was reliant on others when he first arrived in the United States.  He described himself as deferential when experiencing racism, as well as coping with people's impatience and anger with him for any language barriers.

Regarding his race and immigration status, Mr. Nava was completely reliant on a dominant white male with all the resources during his trip with Mr. Groff.  Mr. Groff made comments about his race as well as his residency.  Clearly, Mr. Groff felt bold enough to express his racist views with no fear that Mr. Nava would protest effectively.  Mr. Nava also suffered language barriers, increasing his reliance on Mr. Groff.  Physically, Mr. Nava is much smaller than Mr. Groff.  Mr. Nava's inherent vulnerabilities are obvious.

Nava, Javier                                                                                          page 11

**Confidential Evaluation**

Mr. Groff's power and status, both personally and professionally, necessarily gave him a role perfect for exploiting others. The victims in the group were completely dependent on Mr. Groff for money, food, and transportation. They had no access to resources and likely would not have been able to go on the trip without the Benedetto law firm. Mr. Groff wielded this power openly and in a retaliatory manner when he did not get what he wanted. He withheld food and information. He forced Mr. Nava to come to his hotel room to get food. He drove recklessly, inspiring fear and compliance.

Additionally, Mr. Groff made it clear with his texts and choice of pornography and sexual partners that Mr. Nava was his "type," young, slender men of color. Mr. Nava had to see himself as a sexual object after Mr. Groff's text messages. This made him feel scared and more vulnerable. He elicited help from the other men for protection against Mr. Groff. Mr. Groff preyed upon Mr. Nava due to his sexual orientation as well. Mr. Nava commented that Mr. Groff "never went after Omar" because Omar was straight. Mr. Nava's sexual orientation made him more vulnerable to predation due to many factors, including shame, homophobia, prejudice, and other barriers male victims of sexual abuse and harassment face.

*Helplessness and Loss of Control*

Sexual abuse and harassment are, at least in part, an experience of helplessness and loss of control for all victims. Mr. Nava felt out of control of his situation, as well as felt that the situation was out of control in general. He was reliant on Mr. Groff for real physical needs and safety. Mr. Groff's frightening driving magnified this for Mr. Nava. Mr. Nava could not escape the situation. And most of the group acted to enforce Mr. Nava's continued participation in the trip.

*Fear, Humiliation, Degradation, Violation*

Mr. Nava had valid fears about his safety in the situation. Mr. Groff was sexually persistent and increasingly violating over time. Mr. Groff became blatantly angry, hostile, and reckless. He began acting in a retaliatory manner. Mr. Groff also had resources to become a viable threat, including access to personal information that Mr. Nava saw him put on social media. Mr. Nava's fears were somewhat realized after receiving an intimidating letter following his interview with the media about Mr. Groff.

Mr. Nava was repeatedly humiliated and violated during his trip with Mr. Groff. The violating and degrading sexual material was unexpected. Mr. Nava did not consent to have explicit sexual photos appearing suddenly on his phone. He did not ask to see other men's penises. He was put in a position to have to ask for food, highlighting his dependency on Mr. Groff. It is humiliating to be addressed in lude, sexual ways. It is humiliating to feel like you are "begging" for food. It is degrading and dehumanizing to be referred to in racist ways and be called names that relegate you to the status of an animal.

Mr. Groff audaciously called Mr. Nava's husband to invite him on a trip. This, too, was a very violating and threatening behavior. Not only did this demonstrate Mr. Groff's complete fearlessness of Mr. Nava and lack of concern for consequences for his behavior, it could have threatened Mr. Nava's relationship. It challenged Adrian's loyalty to and protection of Mr. Nava. It proved that Mr. Groff could enter into Mr. Nava's life without fear. It reaffirmed Mr. Nava's concern that Mr. Groff would retaliate.

Mr. Nava was particularly raw to a sense of violation. When he was shot, the doctors left the shooter's bullet inside of Mr. Nava, as it was not causing medical danger at his time of crisis. However, this tremendously bothered Mr. Nava. He said, "I always felt it. There was something he touched in me." Mr. Nava was violated again in a number of ways by Mr. Groff's behavior -- the sexualization, the images, the words, the sense of entitlement that Mr. Groff displayed in his behavior, and again, the violated trust.

Nava, Javier                                                                    page 12

**Confidential Evaluation**

**Conclusions and Recommendations**

Mr. Nava experienced mental injury at the hands of Mr. Groff and by proxy the Law Firm of Conrad
Benedetto who failed in their protection and support of Mr. Nava. He experienced fear, betrayal, and
exploitation. Mr. Nava had the reasonable expectation of care, protection, and safety when he allowed
himself to go on a trip for professional reasons. Mr. Nava experienced an alteration of his world view and
a diminished sense of his value to others. It is easy to clearly identify the wrongness and tragedy of a
mass shooting. This clarity can assist coping. However, sexual exploitation is more insidious, as is the
betrayal of trust. These factors may not be as easily defined or psychologically managed, especially for
Mr. Nava.

Mr. Nava's strengths were used against him, namely his resilience, optimism, trust, and ability to forgive
and see the best in others. His strengths are part of how he could manage and cope with the impact of
the shooting he survived. Mr. Groff used those strengths against him, possibly compromising his future
coping strategies. Mr. Nava needs a way and means to help others; Mr. Groff damaged that with his
behavior.

While Mr. Nava does not present with any diagnosable condition as a result of this injury, the impact of
injury and trauma is not solely defined by diagnosable conditions. The severity of the behavior and the
failures involved should not be mitigated by Mr. Nava's resilience, healing social support, or efforts to
maintain a positive outlook and his well-being. Mr. Nava has been able to cope with some of the
negative impacts of his trauma by helping others, remaining empathic, and engaging in reinforcing
intimate relationships with loved ones.

Mr. Nava would benefit from a return to therapy with a therapist who can provide support, reframing,
and coping skills. This therapist would likely be most effective if the therapist was Spanish speaking. Mr.
Nava should utilize this therapy for as long as necessary to resolve the complex issues of betrayal, trust,
and self-value, including the damage caused by the racism and sexual exploitation. This may take up to
three years of individual treatment.

*All of the opinions contained in this report are given with a reasonable degree of psychological certainty.*

Veronique N. Valliere, Psy.D.
Licensed Psychologist
Diplomate in Forensic Psychology, American Board of Psychological Specialties

Cc:  file